E-FILED
Friday, 10 July, 2026  03:33:03 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 23-cr-30031 |
| | ) | |
| WARNELL REID, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

**SUE E. MYERSCOUGH, United State District Judge**

Before the Court is Defendant Warnell Reid, Jr.'s pro se Motion to Suppress (d/e 57). For the following reasons, the Motion is DENIED.

## I.  PROCEDURAL POSTURE

Defendant was charged via Indictment (d/e 1) on June 6, 2023 with one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1).

From June 23, 2023 to April 14, 2026, Defendant was represented by Assistant Federal Public Defender Robert Scherschligt. On July 22, 2025, this Court entered an Opinion and Order (d/e 43) denying Defendant's Motion to Dismiss Indictment

Page **1** of **25**

as Unconstitutional (d/e 16) under the Second Amendment to the U.S. Constitution and the Supreme Court's holding in <u>Bruen</u>, which was filed by Mr. Scherschligt.  See <u>N.Y. State Rifle & Pistol Ass'n v. Bruen</u>, 597 U.S. 1 (2022).

On April 1, 2026, Defendant filed a pro se Motion to Proceed Pro Se and Motion Objecting to Appointment of Standby Counsel (d/e 52).  This Court held a hearing on Defendant's Pro Se Motion pursuant to <u>Faretta v. California</u>, 422 U.S. 806 (1975), on April 14, 2026.  During that hearing, the Court discussed with Defendant the basis for his request to proceed pro se.  The Court engaged in a colloquy with Defendant regarding his background, the charged offense, possible penalties, the rules that would apply to him at trial, and the Court's opinion as to the effectiveness and advantage of having trial counsel rather than proceeding pro se.

After that colloquy, the Court found that Defendant had knowingly and voluntarily waived his right to counsel and would be permitted to represent himself.

At the <u>Faretta</u> hearing and in his written Motion (d/e 52), Defendant also objected to the appointment of standby counsel, in part due to his belief that he would not personally have ready

access to discovery which he believed would be sent by the Government to standby counsel. This Court asked the Government to explain on the record during the hearing its protocol for discovery in a case with a pro se criminal Defendant and standby counsel. In relevant part, the Government explained that it would typically provide identical copies of discovery to both standby counsel and to a pro se defendant via the standard jail discovery process. The Government expressed its willingness to honor Defendant's preferences by sending paper copies of all written discovery in addition to electronic copies. Of course, any video footage subject to discovery could only be sent via a digital copy to be reviewed by Defendant on a jail computer.

However, the Government also noted that the U.S. Postal Service is currently experiencing delays in the area served by the Central District, such that a defendant's ability to communicate with standby counsel via telephone or in-person visits could prove to be more efficient than the defendant relying exclusively on written communications exchanged between the Government and Defendant through the mail. The Government also advised that it cannot alter the jail's own policies as to a pro se defendant's law

library access or rules limiting the possession of certain papers or other discovery documents in a defendant's cell.

In short, the Government accurately summarized that a pro se Defendant, particularly one without standby counsel, may be at a disadvantage simply because he is reliant on receiving mail through the jail—rather than through email disclosures or telephone communications with the Government—and because he is still subject to the jail's security policies.

Following this discussion about discovery procedures, the Court appointed standby counsel over Defendant's objection, citing McKaskle v. Wiggins, 465 U.S. 168, 184 (1984).

Finally, during the hearing Defendant tendered four pro se Motions (d/e 55-58), including the pending Motion to Suppress (d/e 57), for filing with the Clerk of Court.  On the record and in a subsequent Text Order, the Court ordered the Government to respond to those motions within fourteen days.  The Government filed its Response (d/e 71) to Defendant's Motion to Suppress as ordered.

After reviewing both the Motion and Response, the Court noted that both parties requested a hearing.  Therefore, in a Text

Order (d/e 72) entered April 30, 2026 the Court set this case for a suppression hearing on May 7, 2026.  The suppression hearing began on May 7, 2026 and continued on May 19, 20, and 21, 2026, due in part to lengthy testimony of the two witnesses (Officer Corey Cortes and Sergeant Kristopher Hughes) disclosed by the Government and in part to Defendant's requests for additional witnesses made during the hearings on May 7 and 20.

Specifically, Officer Cortes began his testimony on May 7. During the May 7 hearing, Defendant requested retired Sergeant April Smiddy as a witness.  On May 19, 2026, the Court granted the Government's Motion to Bar Witness at Evidentiary Hearing (d/e 83) relating to Sgt. Smiddy (d/e 85).  Officer Cortes concluded his testimony on May 19, after which Sgt. Hughes began his testimony. Sgt. Hughes concluded his testimony on May 20.  At the end of that hearing Defendant requested Sergeant Timothy Zock and Sergeant Justin Spaid as witnesses.  The Government located those witnesses, and they testified during a final continued suppression hearing on May 21, 2026.

Defendant did not testify.  He did question each of the witnesses and had appointed standby counsel available to him during all suppression hearing dates.

## II.  BACKGROUND FACTS

The following relevant background facts are taken from the exhibits submitted with the parties' written filings (d/e 57, 71, 103, 104, 105), the testimony elicited at the suppression hearing,[1] and the exhibits admitted into evidence at the hearing, which included police bodycam footage from both Officer Cortes and Sgt. Hughes.

On April 9, 2023, certain officers with the Springfield Police Department ("SPD") Street Crimes Unit were performing surveillance of a residence in the 1000 block of Phillips Avenue where drugs and guns had been recovered by the SPD less than one month prior.  A confidential source had notified law enforcement that the occupants of that residence had resumed criminal activity.

---

[1] What follows is a summary of the most relevant testimony based upon the issues raised by the parties and the Court's determination of the credibility of that testimony.  The full transcripts of all four days of testimony are docketed on the record at d/e 93, 94, 96 and 98.

Officers conducting surveillance included Sgt. Zock[2] and Sgt. Spaid, who were both in low-profile (i.e., unmarked) SPD vehicles. Sgt. Zock testified that he was near 10th or 11th Street and Phillips. Sgt. Spaid testified that he was located around 8th or 9th and Phillips. Sgt. Hughes[3] and Officer Cortes were in two marked SPD vehicles in the area but were not within sight of the surveilled residence. The officers in low-profile, unmarked vehicles used radio communication to notify the officers in the marked vehicles what they were seeing at the house under surveillance. The officers consistently testified that those in the low-profile vehicles typically do not take enforcement action, so as not to expose the unmarked vehicles, and instead rely upon the uniformed officers in marked SPD vehicles to do so.

During surveillance on April 9, Sgt. Spaid observed Defendant exit the residence wearing a leather jacket and depart on a bicycle. The temperature outside was 72 degrees. Cortes and Hughes

---

[2] On April 9, 2023, Sgt. Zock held the title of Patrol Officer but has since been promoted.

[3] On April 9, 2023, Sgt. Hughes also held the title of Patrol Officer but has since been promoted.

testified that based on their training and experience it is reasonably common for people to wear thick jackets in warmer weather to conceal items such as firearms.

Sgt. Spaid lost sight of Defendant after he traveled west on Phillips away from the residence.  Sgt. Zock then picked up Defendant's path of travel, observing Defendant travel west on Phillips, turn north on 10th Street for a short distance and then turn around and head southbound on 10th Street.  Defendant continued past Phillips and then past a "No Trespassing" sign onto the 10th Street railroad corridor.[4]

Sgt. Zock observed that Defendant was heading in the direction of Enos Avenue but then lost sight of him.  He relayed his observation of Defendant's path of travel along railroad property on the shared radio channel and asked one or both of the uniformed officers (Cortes and Hughes) to stop Defendant.

---

[4] At the direction of Sgt. Spock, Sgt. Zock took three photographs of the "No Trespassing" sign at the entry to the 10th Street tracks from Phillips sometime after Defendant's arrest on April 9 and before the photographs were uploaded onto the SPD evidence database at the end of May 2023.  Sgt. Zock testified that the photographs captured the sign as it appeared when he witnessed Defendant entering railroad property along the 10th Street tracks on April 9, 2023.

Sgt. Spaid, who had begun driving away from the surveilled residence in his low-profile vehicle and was then traveling on 9th Street, observed Defendant in his rearview mirror as Defendant exited the railroad tracks at Enos.  Sgt. Spaid used his radio to also direct uniformed officers Cortes and Hughes to stop Defendant for the railroad trespassing violation.  Sgt. Spaid testified that while he had probable cause to believe that Defendant had trespassed, he was interested in Defendant because he had come from the surveilled residence.

Sgt. Hughes first located Defendant traveling westbound on Enos through the intersection of 9th Street, where Sgt. Hughes observed Defendant disobey a red traffic light and cross the intersection without yielding to oncoming traffic.  Sgt. Hughes began following Defendant and announced on his radio that he would stop Defendant to address the violations.  He followed Defendant northbound into the alley running north-south between 8th and 9th Streets.  Meanwhile, Officer Cortes stopped his vehicle at the mouth of the alley, with the front of his vehicle blocking the path of Defendant's approach.  Officer Cortes did not personally observe Defendant trespassing on railroad property or running a

red light, nor did Officer Cortes call dispatch to advise that he was attempting a stop of Defendant.

Neither Officer Cortes nor Sgt. Hughes activated their vehicle's emergency lights when stopping Defendant.  In certain SPD vehicles equipped with a dash camera, the camera will automatically begin recording when emergency lights are activated.  However, Sgt. Hughes credibly testified that neither vehicle was equipped with a dash camera because the Street Crimes Unit vehicles, in contrast with traffic unit vehicles, did not have cameras.  During the suppression hearing, Defendant proffered a photograph of Officer Cortes' vehicle and asked Sgt. Hughes to identify equipment visible on the dash.  Again, Sgt. Hughes credibly testified that the equipment was a moving speed radar, not a dash camera.

Officer Cortes activated his body camera while he was inside his patrol vehicle at the mouth of the alley.  As Officer Cortes exited his vehicle and said "hold up," Defendant crashed his bicycle into Cortes' vehicle.  Officer Cortes observed Defendant lying on his side with his hand in a "cradling" or "pinning" position at his waistband, which is also captured on Cortes' body camera footage.  Officer Cortes credibly testified that he understood from his training and

experience the waistband could be holding a firearm.  Immediately thereafter, Officer Cortes began an initial pat-down of Defendant during which he shifted Defendant's leather jacket and observed an L-shaped bulge in his pants.  Cortes testified that based upon his training and experience he knew that a firearm appears as an L-shaped bulge.  Officer Cortes then secured Defendant in handcuffs at 3:25 p.m.

Around the same time, Sgt. Hughes' body camera began recording as he called dispatch to advise that he was getting out of his vehicle to conduct a stop of a male on a bike.[5]  Sgt. Hughes exited his vehicle at 3:25 p.m., as Officer Cortes was securing

---

[5] A complete visual from the body camera was initially obscured because Sgt. Hughes' arm had to cross his body cam in order for him to use his radio to contact dispatch.  Likewise, Sgt. Hughes testified that the body camera has a 30-second audio lag from the time the camera is activated to when audio begins recording.

The Sangamon County Central Dispatch System logged Sgt. Hughes' call at 3:26 p.m. and labeled it as relating to a "suspicious person."  Although Defendant questioned both Officer Cortes and Sgt. Hughes at length about the timestamp and description on the dispatch log, both credibly testified that the speed at which the information is entered and the exact coding used is up to Sangamon County Central Dispatch, not to the reporting SPD officer.

Defendant in handcuffs.  As Sgt. Hughes approached, Officer Cortes notified Sgt. Hughes that he believed Defendant had a firearm on him.  Sgt. Hughes conducted a further pat-down along Defendant's waistband and observed the butt of a handgun.  Sgt. Hughes removed the firearm—a Silver Taurus Model 66 .357 revolver—from Defendant's person.

Officer Cortes then read <u>Miranda</u> warnings off of a written card, which has since been submitted into evidence.  Officer Cortes asked Defendant if he understood his rights, to which Defendant clearly responded, "Yeah, man."

Only after securing Defendant and removing the firearm did Officer Cortes and Sgt. Hughes locate Defendant's identification card.  Officer Cortes then ran Defendant's name through a law enforcement database to determine any criminal history.[6]  Only at that point did Officer Cortes and Sgt. Hughes learn that Defendant was a convicted felon who was not permitted to possess a firearm.

Defendant was not charged with any traffic or trespassing offenses.

---

[6] The Sangamon County Central Dispatch System logged the search for Defendant's name and criminal history at 3:51 p.m.

### III.  ANALYSIS

Because Defendant is pro se, the Court liberally construes his Motion to Suppress.  <u>McCormick v. City of Chicago</u>, 230 F.3d 319, 325 (7th Cir. 2000).  Defendant's Motion (d/e 57) and Supplemental Brief (d/e 104) raise three bases for suppression.  First, Defendant argues that law enforcement had neither probable cause nor reasonable suspicion to stop and detain him.  Second, Defendant argues that law enforcement had no lawful basis to search him for a firearm.  Third, Defendant maintains that law enforcement elicited inadmissible statements from him after taking him into custody and prior to reading him his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

In the Government's Response (d/e 71) and Supplemental Brief (d/e 103), the Government argues that both trespass and traffic violations provided probable cause to stop and arrest Defendant; that a search was lawful either in the form of a pat-down pursuant to a <u>Terry</u>[7] stop or as a search incident to arrest; and that there was no <u>Miranda</u> violation.

---

[7] <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

In Defendant's Reply (d/e 105), he maintains that law enforcement determined that they should stop him before any one of them ever witnessed a trespassing offense or traffic violation. Defendant points to testimony that the officers were interested in his potential connection to the surveilled residence and questions whether they could plausibly view a "No Trespassing" sign along the tracks that he entered and exited.  Defendant also argues that there was no reasonable suspicion that he was armed, beyond his attire and his departure from the surveilled house.  He maintains that no law enforcement officer commanded him to stop and highlights Officer Cortes' testimony during the hearing that he did not necessarily have enough evidence to charge Defendant with fleeing or eluding.

### A.  The Stop of Defendant was Lawful

Law enforcement may lawfully stop an individual if they have probable cause to believe that individual has committed even a minor criminal offense, such as a traffic violation.  See Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001); United States v. Muriel, 418 F.3d 720, 724 (7th Cir. 2005); Ray v. City of Chicago,

629 F.3d 660, 663 (7th Cir. 2011) (arrest lawful even for a "minor traffic offense").

Here, the Court finds credible Sgt. Zock's uncontested testimony that he observed Defendant enter railroad property along the 10th Street tracks and communicated those observations by radio to Officer Cortes and Sgt. Hughes.  During the hearing, Defendant questioned, at length, whether there was a visible "No Trespassing" sign posted when he entered the tracks at Phillips and 10th Street in April 2023.  The Court finds credible Sgt. Zock's testimony that there was such a sign posted at the point where Defendant entered the tracks, which is corroborated by photographs that Sgt. Zock took in April or May 2023 and that were submitted into evidence during the suppression hearing. Regardless, Illinois law prohibits trespassing on railroad property without requiring notice or signage.  625 Ill. Comp. Stat. 5/18c-7503(1)(a)(i)-(ii); cf. 720 Ill. Comp. Stat. 5/21-3.

Defendant also questioned, at length, whether Officer Cortes, who effectuated the stop, and Sgt. Hughes, who participated in his arrest, personally observed the trespassing violation.  However, a law enforcement officer may act on either firsthand observations or

on the collective knowledge of law enforcement officers when they are in communication.  See United States v. Hartsell, 432 F.Supp.3d 805, 816 (N.D. Ill. 2020) (citing United States v. Williams, 627 F.3d 247, 252-53 (7th Cir. 2010); United States v. Ellis, 499 F.3d 686, 690 (7th Cir. 2007)).

During the suppression hearing, the consistent, credible testimony of the witnesses was that the SPD Street Crimes Unit acts as a cohesive team, in which officers conducting surveillance in low-profile vehicles relay information via radio to uniformed members of the Unit who can make stops in marked SPD patrol vehicles.  More specifically, the uncontroverted testimony at trial established that Sgt. Zock relayed his observation of Defendant's path of travel along the railroad tracks on the radio channel to Officer Cortes and Sgt. Hughes and asked them to conduct a stop.

"The collective knowledge doctrine permits an officer to stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action."  Williams, 627 F.3d at 252.  That is, "[u]nder the collective knowledge doctrine, the knowledge of one

police officer is imputed to other officers when they are in communication regarding a suspect." Ellis, 499 F.3d at 690 (internal quotations omitted).  Therefore, Officer Cortes and Sgt. Hughes were lawfully permitted to conduct a stop of Defendant based upon the collective knowledge of the Street Crimes Unit in the form of radio communication from Sgt. Zock establishing that Defendant had committed the offense of trespassing on railroad property.

In addition, following the trespassing violation observed by Sgt. Zock, Sgt. Hughes testified that he personally observed Defendant run a red light, i.e., disobey a traffic-control device in violation of 625 Ill. Comp. Stat. 5/11-305(a), at the intersection of 9th Street and Enos.  See also 625 Ill. Comp. Stat. 5/11-1592 (traffic laws apply to persons riding bicycles).  Further, Sgt. Hughes credibly testified that he alerted the other Street Crimes Unit officers by radio of the red-light violation and of his intent to stop Defendant.  Therefore, under the collective knowledge doctrine Officer Cortes could also rely on Sgt. Hughes' observation of the traffic violation as a basis for stopping Defendant.

Finally, Defendant has suggested that the actual motivation for the stop was neither the trespassing violation nor the traffic violation. Rather, Defendant argues that Officer Cortes and Sgt. Hughes stopped him because he had departed from a residence where criminal activity was suspected to be ongoing. See United States v. Johnson, 170 F.3d 708, 719-20 (7th Cir. 1999) ("[N]o court has yet held that the police may search any apartment in a public housing project whenever they want, without a warrant, simply because they believe that drugs may plague that particular project.… Without reasonable suspicion, they cannot detain a person just because that individual walks out of an apartment on New Year's Eve, even if some unspecified individual…thinks something fishy is sometimes going on there."). Likewise, Defendant has drawn the Court's attention to the fact that none of the officers charged him with trespassing or traffic violations. Further, Sgt. Hughes testified that the Street Crimes Unit officers were interested in Defendant due to him coming from the surveilled drug house that day.

However, Supreme Court precedent "make[s] clear that an arresting officer's state of mind (except for the facts that he knows)

is irrelevant to the existence of probable cause.  That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." Davenport v. Alford, 543 U.S. 146, 153 (2004) (internal citations omitted).  Therefore, the stop of Defendant was lawful because Officer Cortes could reasonably rely upon the radio reports of trespassing and red light violations by other members of the Street Crimes Unit, regardless of whether the actual motivation for the stop was interest in Defendant's connection to the surveilled residence.

In sum, Defendant's Fourth Amendment rights were not violated when he was stopped by Officer Cortes on April 9, 2023, and there is no basis to suppress any evidence because of the stop.

## B.  The Search of Defendant was Lawful

When law enforcement officers make even a brief investigatory stop based only on reasonable suspicion—rather than the more demanding probable cause standard—they may lawfully conduct a frisk or pat-down search for weapons when they can "point to specific and articulable facts indicating that criminal activity may be afoot and that the person with whom he is dealing may be armed

and dangerous." United States v. Howell, 958 F.3d 589, 598 (7th

Cir. 2020) (quoting Terry, 392 U.S. at 21, 24-25, 30); see also

Ramos v. City of Chicago, 716 F.3d 1013, 1017 (7th Cir. 2013).

Here, the officers consistently and credibly testified to the facts

that led them to believe that Defendant may have been engaged in

criminal activity and may have been armed.  These observations

included that Defendant had departed from a house from which the

SPD had recently recovered illegal drugs and guns and whose

occupants had been reported to have resumed criminal activity, and

that Defendant was wearing a leather jacket while bicycling in 72

degree weather.  The officers credibly testified that, based upon

their training and experience, individuals attempting to conceal

weapons often wear heavier clothing than the weather would

warrant.  Defendant's path of travel observed by the officers could

accurately be described as circuitous and evasive, with Defendant

traveling in a nonlinear path—first traveling northward, then

doubling back and traveling southbound—in addition to trespassing

on railroad property rather than traveling on a nearby public street

and crashing in an alley after again reversing course and heading

northward.  See United States v. Brignoni-Ponce, 422 U.S. 873,

Page **20** of **25**

(1975) ("[A] driver's behavior may be relevant, as erratic driving or obvious attempts to evade officers can support a reasonable suspicion."). Finally, the Court finds that Officer Cortes' bodycam video corroborates his reasonable observation that Defendant had his hand along his waistband as Officer Cortes approached. Officer Cortes credibly testified that, based upon his training and experience, the waistband is a common location for firearms to be carried or concealed.

For these reasons, the Court holds that the pat-down search of Defendant was lawful because Officer Cortes identified specific and articulable facts giving rise both to a reasonable suspicion of criminal activity and that Defendant may have been armed and dangerous.

Further, law enforcement may lawfully conduct a search incident to an arrest supported by probable cause. United States v. Thomas, 512 F.3d 383, 387 (7th Cir. 2008) (full search incident to an arrest is reasonable under the Fourth Amendment in order to find weapons). As long as there is probable cause to stop someone for a crime—even a minor one like a traffic offense—the Fourth Amendment permits an arrest. Atwater v. City of Lago Vista, 532

U.S. 318, 354 (2001); United States v. Childs, 277 F.3d 947, 953 (7th Cir. 2002) (*en banc*).  This is true even when arresting someone for a traffic violation is admittedly "outside the norm."  Tapley v. Chambers, 840 F.3d 370, 378 (7th Cir. 2016).

As discussed above, probable cause existed to stop—and therefore to arrest—Defendant for the trespassing and red light violations.  In addition, as with the initial justification for a traffic stop, an officer's subjective motivation for an arrest is irrelevant in determining whether probable cause existed for that arrest.  See Tapley, 840 F.3d at 377-78.  Therefore, Officer Cortes and Sgt. Hughes were also justified in conducting a search for weapons incident to arrest.

In sum, Defendant's Fourth Amendment rights were not violated when he was searched for weapons by Officer Cortes and Sgt. Hughes on April 9, 2023, and there is no basis to suppress any evidence due to that search.

## C.  Defendant was Properly Mirandized

"Under Miranda, a suspect interrogated by law enforcement officers while in custody must be notified of his constitutional rights to counsel and against self-incrimination."  United States v.

Thompson, 496 F.3d 807, 810 (7th Cir. 2007) (citing Miranda, 384 U.S. at 444).  "Before Miranda warnings are required, however, 'the suspect must be both "in custody" and subjected to "interrogation...."'" Thompson, 496 F.3d at 810 (quoting United States v. Barker, 467 F.3d 625, 628 (7th Cir. 2006)).

The bodycam video evidence in this case establishes that Defendant was properly Mirandized.  Approximately one minute elapsed between the time that Officer Cortes exited his vehicle and the time that Defendant was placed in handcuffs.  Officer Cortes conducted a brief visual inspection of Defendant's clothing, identified an L-shaped bulge after moving one side of Defendant's leather jacket, and then received Sgt. Hughes' assistance in retrieving the firearm via a pat-down search.

As soon as Defendant was secured in handcuffs, Officer Cortes read Defendant his Miranda rights.  In response, Defendant verbally acknowledged that he understood those rights.  Although Defendant complained about Officer Cortes' patrol vehicle having blocked his path through the alley and volunteered general allegations that "they set me up" without further details, he remained relatively calm and chose to engage with the officers on

certain topics while ignoring their questions on others.  Defendant was not held in conditions that were coercive or intimidating beyond a typical public arrest.  When he complained of possible injuries from crashing and then falling off of his bicycle, the officers called for EMT.  In sum, the bodycam footage captures the knowing waiver by Defendant of his <u>Miranda</u> rights.  <u>See</u> <u>United States v. Jackson</u>, 300 F.3d 740, 748 (7th Cir. 2002) ("[W]hether a person in custody knowingly and voluntarily waives his <u>Miranda</u> rights depends upon the totality of the circumstances…[and] may be inferred from the defendant's understanding of his rights coupled with a course of conduct reflecting his desire to give up his right to remain silent and have the counsel of an attorney." (internal quotations omitted)).

Further, although the Court would not characterize any of Defendant's pre-<u>Miranda</u> statements as incriminating, voluntary statements uttered prior to any interrogation and before <u>Miranda</u> warnings are given are admissible.  <u>United States v. Westbrook</u>, 125 F.3d 996, 1002 (7th Cir. 1997).

For these reasons, the Court holds that there is no basis to suppress any of Defendant's statements because he was properly

advised of his <u>Miranda</u> rights and knowingly and voluntarily waived those rights.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (d/e 57) is DENIED. This case remains set for a Jury Trial beginning August 3, 2026 at 9:00 A.M. and a Final Pretrial Conference on July 22, 2026 at 10:00 A.M. The parties are reminded to comply with the deadlines in the undersigned's Standing Order on Final Pretrial Conferences, Exhibits, and Jury Instructions.


**IT IS SO ORDERED.**
**ENTERED: July 10, 2026.**
**FOR THE COURT:**

/s/ Sue E. Myerscough
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**